IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SURENDER MALHAN, for himself and as parent of E.M and V.M., and SPACEAGE CONSULTING | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 2:16-cv-8495 |
| v. | ) ) | Jury Trial Demanded |
| GURBIR GREWAL, in his official capacity As Attorney General of New Jersey, STATE OF NEW JERSEY, OFFICE OF CHILD SUPPORT SERVICES,  NATASHA JOHNSON in her official capacity as DIRECTOR DIVISION OF FAMILY DEVELOPMENT,LARRY ASHBRIDGE, CHIEF, CHILD SUPPORT ENFORCEMENT,  NJ OFFICE OF PROBATION SERVICES DONALD KESSLER, DAVID B. KATZ John Does, numbers 1 through 10, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**THIRD AMENDED COMPLAINT**

Jurisdiction

1.  This Court has jurisdiction over this matter under 28 U.S.C. §1331.  Plaintiffs maintain this action under 42 USC §669a, 42 U.S.C. §1983, and the Declaratory Judgment Act, 28 U.S. Code § 2201 et seq..

Summary

2.  Plaintiffs seek declaratory and injunctive relief, as well as damages pursuant to 42 USC §669a, 42 U.S.C. §1983, to have the disclosure and seizure of Malhan's bank accounts to be illegal under 42 USC §669a, as well as unconstitutional under the Fourteenth Amendment.

<u>Parties</u>

3.  Surender Malhan is an adult residing in Hudson County, Jersey City, New Jersey.  He owns a small company started in 1996.   He is father of the minor children E.M. and V.M.. Malhan brings this suit on behalf of himself and his minor children.

4.  SpaceAge Consulting is a small business owned by Surender Malhan, it has been served a Notice of Garnishment demanding that it illegally garnish "wages" of Surender Malhan.

5.  Defendant Gurbir Grewal is Attorney General of New Jersey tasked with defending the legality of New Jersey laws and practices.

6.  New Jersey state agency defendants and their heads are agencies tasked with enforcing various child support regulations pursuant to federal law.

7.  Defendant Donald Kessler is a former Judge of the New Jersey Superior Court (now retired) he is sued in his personal capacity.

8.  Defendant David Katz is a Judge of the New Jersey Superior Court who took over from Judge Kessler and who has implemented the retaliatory actions of Defendant Donald Kessler.

9.  Other Individual Defendants, including John Does number 1 through 10 sued in their official and individual capacity are presumably officials tasked with administration and enforcing New Jersey law, who inter alia, caused the illegal release of confidential financial information, and are sued in their capacity as administrators tasked with enforcing policies which deny plaintiffs constitutional rights under color of law; they are persons within the meaning of 42 U.S.C. §1983 with respect to declaratory and injunctive relief sought in this case.

*Facts Relevant to All Counts*

10. On February 24, 2011, Alina Myronova, mother of Malhan's minor children filed an Order to Show Cause in Hudson County Family Court asking that full physical and legal custody of the parties' two children be given to her.

11. Malhan had less than two hours' notice of a legal proceeding and had no time to seek legal advice or obtain counsel.

12. Malhan was not permitted to cross examine Myronova or present evidence in his defense, but the Court stripped Malhan of physical and legal custody ordering Myronova to assume full legal and physical custody of the two children indefinitely.

13. On April 1, 2011, the Court awarded $3000 per month in child support to Myronova as well as $3000 per month in spousal support based on the assumption that Myronova was had sole custody with 100% of overnights.

14. When the court awarded $3000 per month each in spousal and child support in April 2011 Myronova was unemployed and her income was considered to be $0.

15. The Court also ordered that Myronova would be permitted to collect rent on properties jointly in the name of the two parties, but that these funds were to be used only to pay for mortgages.

16. The mortgage payments were more than the rents collected and Malhan was ordered to pay Myronova the difference between the rent collected and mortgage and maintenance payments due. The payments from Malhan to Myronova for properties (over and above the rent collected) varied somewhat but averaged about ten thousand dollars each month—between February 2011 and August 2012 Malhan paid Myronova $151,671 in post separation salary for the rental units which she was court ordered to use to pay mortgages.

17. On February 3, 2012 the Court again ordered that "Plaintiff [Myronova] shall send to Defendant [Malhan] … payment information for payments of mortgages … that were not covered by the rental income … and Defendant shall reimburse Plaintiff that amount."

18. Prior to February 2012, however, one of Malhan's mortgages had been reduced by approximately $2000 per month, but Myronova did not report this to Malhan and continued to demand that he give her about $2000 each month more than the actual mortgage amount due.

19. In June 2012 Malhan filed a motion in the family court demanding that Myronova repay him the money that Myronova collected from him under the false pretence of using it to pay rent—an amount of at least $22,000.

20. Myronova was forced to admit that she had collected more money than was needed to pay rent but argued that she should be permitted to keep all the money as a loan against equitable distribution. The Court granted in part and denied in part this request ruling:

> THE COURT: It's always very simple to just say there's plenty of money here at the time of final judgment. When we estimate the equitable distribution, she'll be getting a lot of money, a lot more than $22,000, so let's hold it off until then. It's wrong. She knew it was wrong. And she let him keep thinking that what was happening was correct. … Half of the money was his, half of the money was hers. I'll allow her to have an advance against equitable distribution at this time of $11,000. The remainder she has to reimburse to him.

21. It should be noted that in 2018, Malhan made a motion for Summary Judgment on (inter alia) the fact that Myronova owned him $11,000 plus interest accruing from 2012.

22. Had Malhan been granted summary judgment on this issue then the amount of the judgment would have been used to offset his theoretical debt to Myronova

23. Myronova did not dispute any of the facts that she had essentially embezzled at least $11,000 in 2012; but she argued that summary judgment on this issue should not be decided on summary judgment because discovery in the 7-year-old case was still ongoing.

24. However, Myronova failed to offer any argument what discovery with respect to the 6-year-old embezzlement issue was still needed.

25. The Court sided with Myronova and refused to grant summary judgment ruling: "these issues are not ripe for summary judgement. Now, there is discovery pending." Tr. Oct 19, 2018 162:15-16.

26. Myronova kept sole legal and physical custody of the two children for sixteen months, until June 2012 when she agreed to permit joint custody because she wished to move out of the area to take a job and begin living with her boyfriend.

27. In July 2012 the family court ruled:

> THE COURT: I will implement the 50 percent parenting time arrangement **which will become the status quo from this point forward**.

July 3, 2012 Tr. 16:15-17.

28. The roughly 50/50 arrangement remains the status quo as of December 2019 and this has never been vacated.

29. In August 2012, at the same proceeding at which the $22,000 debt was discussed, the Court approved a custody schedule which provided for 50/50 custody during the summer school vacation, but during the school year the two children living with Malhan Monday through Friday morning and the children staying with Myronova Friday night, Saturday and Sunday.

30. The arrangement describe in the above paragraph has resulted in Malhan having 54% of overnights since 2012—which makes him the custodian parent and parent of primary residence under federal and state law.

31. The 54% custody schedule was made official in a Court Order dated 8/24/2012, which has never been vacated.

32. In 2012, Malhan asked the Court to recalculate child support based on the facts that he had gone from 0% custody to 54% custody and also that Myronova was now working and had a substantial income, but the Family Court refused to recalculate child support.

33. In an Order dated August 24, 2012, Malhan's motion to recalculate child support was "denied without prejudice pending final judgement." Paragraph 3.

34. As of August 24, 2012, Malhan was paying $3000 per month in spousal support and $3000 per month in child support, but Myronova owed Malhan $22,000 as a result of the misappropriation of rent money described above.

35. The August 2012 Court order required Myronova to repay Malhan $1000 per month for eleven months to reimburse him for half of the $22,000 she had misappropriated, however, Myronova failed to make the required payments.

36. In February 2013 the Court ordered that spousal support be reduced by $1000 per month for eleven months to repay the $11,000 out of the $22,000 which the Court had ordered to be repaid in August 2012.

37. In April 2013, Myronova admitted in a deposition that she was cohabiting with her boyfriend and that her boyfriend was helping to pay for expenses. As a result in Malhan filed a motion to terminate spousal support.

38. As of May 2013, Myronova had only repaid $3000 of the total $22,000 she had misappropriated from mortgage funds—leaving an immediate debt of $8000 and a total debt of $19,000.

39. In May 2013, the Court granted in part Malhan's motion to terminate spousal support based on cohabitation but rather than terminating the support the court found that Myronova had been co-habitating since June 2012 and reduced the spousal support to $1000 per month retroactive to July 1, 2012.

40. This retroactive adjustment of spousal support to July 1, 2012 (or ten months) resulted in Myronova owing Malhan another $20,000—a total now of $39,000 Myronova owed Malhan.

41. Again rather than making Myronova repay the entire $20,000 overpayment in spousal support, the Court only required Myronova to repay half the amount (i.e. $10,000) in $1000 dollar a month payments over the next ten months. The other $1000 a month payments were halted apparently because the Court believed that

making Myronova repay more than $1000 a month might adversely affect the children.

42. The Court also apparently did not extend the repayment plan beyond ten months assuming that there would be a final judgment in the next ten months. In any event, at the end of the ten month repayment period, Myronova would still own Malhan $29,000 (including the $11,000 "advance on distribution").

43. Trial did not take place as expected in 2013, however, Malhan uncovered evidence that Myronova had deliberately falsified evidence and committed perjury to defraud Malhan. Specifically, funds collected from rent which were supposed to go to pay mortgages had actually been transferred to Myronova's mother. Myronova had then altered the check written to her mother to make them appear that they had been written to a mortgage company and provided copies of the these checks (one for $35,000 and one for $11,000) to Malhan in discovery.

44. As a result of fraud and falsification of evidence, the Court permitted additional discovery on the falsification of evidence and trial did not take place in 2013.

45. When trial which had been scheduled for September 2013 was cancelled Malhan again asked the Court to recalculate child support, noting that trial had been delayed and that Myronova's income had increased again to $65,000 from $0.

46. On January 10, 2014 the Court denied Malhan's motion to recalculate child support ruling that although Malhan had shown a change in circumstance the Court would wait until final judgment to make an adjustment.

47. Another issue which arose in 2014 was that the IRS ruled that Malhan and Myronova owed $92,000 in additional taxes on their joint 2010 tax return.

48. Malhan paid off the $92,000 in a series of payments from his post-separation income, and asked the court to permit him a credit against any theretical debt he might owe Myronova for Myronova's share of the tax debt—but the court has not allowed him a credit of any money at all with respect to the joint tax debt.

49. In May 2015 with trial still not scheduled and Myronova's income increasing Malhan again filed a motion asking the Court to recalculate child support.  At this point Malhan had been parent of primary residence for nearly three years, and Myronova's income had gone from $0 to at least $65,000.

50. In an Order dated June 23, 2014 the Court again denied Malhan's request for a recalculation of child support ruling that the issue would be taken up at the time of trial.

51. In a bizzare twist, Myronova requested and was granted a "Gag Order" from the Family Court.  As a result of this Gag Order a federal suit was filed in which U.S. District Judge Martini ruled that the Gag Order as alleged was unconstitutional as alleged:

> The Gag Order—which is attached to the SAC—broadly prohibits Malhan from discussing any aspect of his divorce, including his experiences during child custody proceedings. (SAC at ¶ 17). The SAC alleges that despite its far-reaching scope, the Gag Order was issued "in a summary proceeding without any evidentiary hearing or any weighing of competing interests...." (SAC at ¶ 26). The SAC further alleges that Judge Sivilli made no specific findings regarding Mr. Malhan and his children with respect to the need for a gag order, and instead issued the Order "based on a generalized finding that publicity in family court is not in the best interests of children." (SAC at ¶¶ 18, 26). The Court therefore rejects Defendants' argument that Nichols has failed to adequately allege a First Amendment violation.

Nichols v. Sivilli, CIV. 2:14-3821 WJM, 2014 WL 7332020, at *6 (D.N.J. Dec. 19, 2014)

52. As a result of this ruling Judge Sivilli recused herself from the case in January 2015 and no action at all on the case happened for nearly six months.

53. The Gag Order, however, continued to delay things.  The new judge, Judge Kessler, took over the case and on May 29, 2015 Judge Kessler ordered a Plenary

hearing for June 18, 2015 at which Myronova would be permitted to call witnesses and present evidence in support of her demand for a Gag Order.

54. The Court, per three different judges, repeatedly had denied Malhan a plenary hearing with respect to child support or spousal support stating that it had no time for a plenary hearing—yet took time to schedule a plenary hearing for a Gag Order

55. On June 18, 2015 Myronova presented no evidence whatsoever at the plenary hearing, but the Court, per Judge Kessler, did not vacate the entire Gag Order (which was presumably unenforceable based on Judge Martini's ruling) but only vacated the Gag Order in part.

56. In October 2015, Malhan filed another motion with the Court pointing out that he had exhausted his resources repaying the $92,000 IRS debt (which he paid all by himself) and asking the Court to credit him half this $92,000 payment which was not disputed to be a "marital" debt.

57. In addition to this $46,000 Myronova owed Malhan for the IRS debt she still owned him the other $29,000 discussed above, meaning he was entitled to at least a $75,000 credit vis-a-vis Myronova.

58. Malhan noted that he was continuing to pay the difference between the rents collected and the mortgage on the rental properties, and these payments were eating up the bulk of his income. Malhan informed the Court that given the payments for mortgage and the depletion of his resources to pay the large IRS debt he would find it very hard to pay $3000 in child support.

59. The court made only slight adjustments to Malhan's payments, however. On February 9, 2016 the Court, per Judge Kessler, ruled that Myronova had refused to obtain health insurance for herself (and had then lied to the court claiming that she was not eligible for health insurance from her employer). As a result the Court did reduce the spousal support payment to $714 per month retroactive to January 1, 2015--which essentially just allowed Malhan a credit towards spousal support for the amount of health insurance payments he was making.

60. The February 9, 2016 adjustment was apparently not communicated to the Office of Child Support Services which continued to insist that Malhan was required to pay $1000 a month in spousal support plus pay for her health insurance. **Exhibit 2 to ECF #1.**

61. In February 2016, in response to a court order, Myronova filed a Case Information Statement showing that her income had increased to over $100,000 (up from $0 in 2011). In November 2016, in response to a further Court Order, Myronova submitted a pay stub showing that she had earned over $91,000 from January 1 through October 29, which put her on pace to earn over $110,000 in salary for 2016.

62. In 2016 Malhan failed to pay the full amount of spousal and child support which has been ordered, however, Malhan through several motions has asked the court to 1) recalculate spousal support, 2) recalculate child support, and 3) give him credit for some or all of the $19,000 remaining from the embezzlement of rental funds, the $10,000 still owed from the recalculation of spousal support due to co-habitation from 2013, and the $46,000 in IRS debt.

63. Were the court to credit Malhan with some or all of the above debt Malhan's theoretical support debt would be wiped out--in fact, Myronova would owe Malhan money.

64. On or about October 26, 2016, Malhan filed a motion with the court to recalcuate child support which attached over 1500 pages (approximately 1519 pages) of documents (largely financial documents) including hundreds of pages of bank records, tax returns, case information statements, credit card records and much more documenting that Malhan's financial situation in 2016 made it impossible for him to pay $3000 per month in child support and further documenting that Myronova was in fact living a luxurious life style including travel and spending hundreds of dollars each month on alcoholic beverages.

65. In fact, it was only discovered a couple years later that Myronova and her boyfriend Jeff Rothstein had won a $1 million Powerball second place jackpot in 2013.

66. The Oct 26, 2016 motion requested a return date of December 2, 2016 but it was not heard that date and decision on the motion was postponed indefinitely.

67. This issue of credits due to Malhan was pending with the Superior Court for months in 2016 through 2017.

68. While the October 26, 2016 motion was pending, on November 3, 2016, the Office of Child Support Services issued a Notice of Levy on Malhan's bank account first freezing and threatening to seize all of his money. **Ex 1 to ECF # 1.**

69. The $24,000 noticed for levy included $16,500 in tenant security deposits. According to N.J.S.A. 46:8-19 such deposit are not the property of Malhan but are held in trust for his tenants.

70. On or about **December 1, 2016**, the Office of Child Support Services removed the levy on the bank account, but called this a one-time event. **Ex 3 to ECF # 1.**

71. Malhan thus remains potentially subject to further levy despite being the parent of primary residence and not actually owing any money (due to the credits he is owed).

72.    The motion to recalculate child support was not heard by the family court for almost a year—long after the filing of this suit.  See ECF # 1.

73.    In February 2017 (again while the Ocotber 26, 2016 motion was still pending) the family court judge stated on the record that he believed Mr. Malhan was correct that he should not be paying child support at all:

> THE COURT:      And what it really brought to my attention in a way that is much clearer to me is that Mr. Malhan has four overnights a week. And this started quite a while ago when Ms. Myronova had a boyfriend and she moved to Pompton Plains. And for a considerable point of time, he's had it appears to me primary custody.
> …

> THE COURT: Any time I've done a guidelines calculation, you know and I've done calculations, I've never done a calculation for a parent who is not the parent of primary residence. I've done quite a few of them.

74.    Given the Court's preliminary comments on the pending motion that it was likely to rule in favor of Malhan made no further child support payments.

75.    Despite the above comments the court issued no formal order or resolution of the October 25, 2016 motion.

76.    Finally, at a proceeding on July 13, 2017 the family court summarily denied Malhan's Ocotber 26, 2016 motion for a credit for child support (which had been pending since approximately November 1).

77.    The family court apparently ruled that Malhan needed to show changed circumstances for any sort of credit and that there were no changed circumstances (despite what the Court had stated on the record in February).

78.    The Court <u>sua sponte</u> ordered that Malhan would not only resume paying $3000 per month in child support but also pay another $4000 in "arrears" payments which the Court ordered to be garnished from Malhan's salary.

79.    Specifically the family court stated:

> I need to turn to the issue of arrears because I think it impacts Ms. Myronova's ability to pay counsel fees. And I don't know why this didn't occur to me before today, but today the light went on.  Mr. Malhan is employed by a corporation, SpaceAge. I am going to order a wage execution on his SpaceAge wages for arrears. So I'm going to need to see his pay stub, Mr. -- his income from last year Mr. Clark. And I'm going to order that amount. And I'm going to do it without delay. Those arrears are going to get paid off. And one thing that's going to happen now, is there's going to be income withholding from his check for the support every -- every week, or every other week, however he's paid.   And if he changes his mode of payment that is going to certainly raise the Court's antennae. So I don't want the Court to be maneuvered or manipulated. And if that doesn't work I'm going to liquidate one of his assets.

Tr. 9:1-19

80.    The phrase "And I don't know why this didn't occur to me before today, but today the light went on" reflects that the family court ordered the garnishment sua sponte and without notice or warning to Malhan or SpaceAge--despite the fact that the motion had been pending for eight months.

81.    Despite Malhan having submitted over 1500 pages of documents as part of his motion, the family court seemed to be unaware of Malhan's income or method of payment, because the family court raised the garnishment issue sua sponte— although Malhan had submitted numerous case information statements that could have been reviewed by the family court.

82.    As of July 2017 Myronova had a higher household income than Malhan yet her income continued to be regarded as $0 as set in 2011.

83.    Counsel for Malhan's wife raised the issue that the Court did not know how Malhan was compensated; the proceeding continued:

> MR. KORNITZER [Myronova's Counsel]: You know a garnishment is only effective if there's regular payments.
>
> THE COURT: How do you pay yourself, Mr. Malhan?
>
> MR. MALHAN: It depends on the cash flow, Your Honor. Most of the bulk of my salary I take it as an advancement as my tax year ends on the 31st of March every year. I take it in advance.
> THE COURT: So how much have you – how much have you paid yourself so far this year?
> MR. MALHAN: Off the top of my head, I collect maybe 60,000 or 80,000.
> THE COURT: How much money of that do you have in a bank account?
> MR. MALHAN: I have paid myself that and I have put back in the SpaceAge account to do payroll, and every month that I am now taking it out in installments, which I would have the right to take on monthly.
> THE COURT: So he's taking it back out --
> MR. KORNITZER: Garnishment is not going to work.
> MR. MALHAN: In installments.
> THE COURT: He's paying himself every month.

> MR. MALHAN: This is just to minimize the federal tax on the
> SpaceAge.
> THE COURT: Well it's going to be taken out of those installments.
> And if those installments stop, then you can come in on order to show
> cause, because my zero tolerance, I'm going to st[art] selling assets,
> maybe including SpaceAge.

Tr. 59:24–61:4

84.     As Malhan noted in the above quote, SpaceAge paid Malhan the bulk of his salary for the year in March 2017 for the February pay-period.

85.     SpaceAge made this arrangement for tax purposes and long before there was any hint of any garnishment.

86.     In fact, when SpaceAge and Malhan made the arrangement every indication was that the family court had recognized there was no child support arrearage.

87.     In February 2017 the same family court judge stated on the record:

> THE COURT:     And what it really brought to my attention in a way
> that is much clearer to me is that Mr. Malhan has four overnights a
> week. …  And for a considerable point of time, he's had it appears
> to me primary custody.   …
> I've never done a calculation for a parent who is not the parent of
> primary residence. I've done quite a few of them.

88.     Malhan had actually received a total net salary (or disposable income) disposable income for all of 2017 of $54,568.10 broken down as follows:

| | |
|---|---|
| January | 4,076.21 |
| February | 4,076.21 |
| February Special Pay | 42,339.47 |
| March | 4,076.21 |
| April  - Sept | 0.00 |

89.     The family court then stated that because garnishment would take time the Court in lieu of garnishment would order Malhan to make an immediate cash payment of $4000.

> THE COURT: What day of the week do – when in the month do you
> get paid?

MR. MALHAN: The 15th of the month, Your Honor.

THE COURT: Okay, the 15th of the month it's going to be garnishment every 15th of the month. So make sure that I have that order so we can get it to probation and they put it in effect before the 15th. And it's going to have to go Hudson County. And you ought to talk to Hudson County Probation. If there's anything that I need to do to make it be effective, I will talk to [Hudson County Presiding Judge] Judge Matineo about it.

MR. KORNITZER: Okay.

THE COURT: I can't be clearer than that. And if I have to talk to Judge Matineo to make sure that it becomes effective on the 15th of this month, I will talk to Judge Matineo. And we don't have a lot of time it's the 12th today. I need that order tomorrow. Because Friday is the -- Friday is the 14th. Would you get your check the 14th or the 17th this month?

MR. MALHAN: I get it on the 15th, Your Honor.

THE COURT: Even if it's a Saturday?

MR. MALHAN: No then maybe it's a day before, or a day later.

THE COURT: Well I'm telling you point blank here that I want you to pay over to Mr. Clark so we don't have to wait for the garnishment. Whatever the amount is you're going to pay that amount, just write a check directly to Mr. Kornitzer's trust account.

MR. KORNITZER: And it will be adjusted then.

THE COURT: Yes, it will be adjusted. So I want a check written so we don't get into a snafu for this month.

MR. KORNITZER: Right. Okay.

THE COURT: And if that doesn't happen then --

MR. MALHAN: Your Honor, I don't have money in SpaceAge to pay -- the money I have now is for month-to-month to pay my SpaceAge employees.

THE COURT: But you say you also pay yourself.

MR. MALHAN: I pay myself about 5,000, 10,000 every month -- 5,000 to 6,000 or so.

THE COURT: Well it's going to come out of that five or 6,000.

MR. MALHAN: Then allow me to sell some properties. I can't pay mortgage on any property then. I can't pay mortgage on any property with that.

…

THE COURT: What property are you going to sell?

MR. MALHAN: I would like to sell all six rental properties then. It's a drainage on my money then. I mean I'm bleeding money on that for the last six years for nothing. I would like to sell them out.

THE COURT: Well regardless of whether they're going to be sold or not, in the meantime I'm still going to garnish that money.

MR. MALHAN: I won't be able to pay my employees then next month.

THE COURT: [angrily] Well that will be your problem then.

Tr.  61:9-63:23.

90.   Although the family court had spoken about sending an order to County Probation right away, no order was entered until August 1, 2017.

91.   At the proceeding July 12, the Court stated that it would not allow the filing of any motions for reconsideration without prior permission of the court (which itself is a violation of New Jersey case law).

92.   While the parties were waiting for the court to issue a formal Order counsel for Malhan and SpaceAge sent a letter to the court on 7/28/17 stating:

> Because the court sua sponte brought up the issue of garnishment at the last hearing (and consequently there was no briefing on the issue), I have been hopeful that the court would sua sponte reconsider.  If the court is not going to sua sponte reconsider we request either that 1) the court permit full briefing on the issue before an order is entered or 2) allow a motion for reconsideration.  We believe the discussion as to how the garnishment issue would be addressed indicates that a garnishment order such as the one proposed would be illegal under federal and state law which provide for very specific procedures including 1) garnishment against a custodial parent is not permitted. 2) there are specific procedural requirements mandated by federal law including adequate notice and 3) garnishment is limited to specific percentage of income which has been exceeded here.

The Child Support Enforcement Act limits garnishment actions to non-custodial parents.

45 CFR 302.70(a) ("Required Laws") provides in relevant part
> The State plan shall provide that, in accordance with sections 454(20) and 466 of the Act and part 303 of this chapter, the State has in effect laws providing for, and has implemented procedures to improve, program effectiveness:
> Procedures for carrying out a program of withholding under which new or existing support orders are subject to the State law governing withholding so that a portion of the noncustodial parent's wages may be withheld, in accordance with the requirements set forth in § 303.100 of this chapter[.]

Section 303.100 ("Procedures for income withholding") provides in relevant part:
> (a) General withholding requirements.
> (1) The State must ensure that in the case of each noncustodial parent against whom a support order is or has been issued or modified in the State, and is being enforced under the State plan, so much of his or her income as defined in sections 466(b)(1) and (8) of the Act must be withheld, in accordance with this section, as is necessary to comply with the order.
> … (2) The total amount to be withheld under paragraphs (a)(1), (a)(2) and, if applicable, (f)(1)(iii) of this section may not exceed the maximum amount permitted under section 303(b) of the Consumer Credit Protection Act (15 U.S.C. 1673(b)).

93.    On August 1, 2017 the family court entered two orders ordering that Malhan immediately pay $4000.

94.    Also on August 1, 2017 the family court issued a second order entitled "Wage Garnishment Order" which directs that Malhan was directed to pay $4,000 on the 15th of each month, "through the Essex County Probation Department, via wage garnishment to begin on August 15, 2017" … "in addition to the required Child Support Payments ($3,000 per month)."

95.    Malhan also filed a motion with the Appellate Division on August 18, 2017 for permission to file an interlocutory appeal but it was denied.

96.   The Appellate motion was e-filed with the Appellate Court at 1:49 pm.

97.   At 2:11 pm on August 18, 2017, Counsel for Malhan (Clark) sent an email to all parties and the court's judicial clerk informing that an appellate motion had been filed, which stated:

> **Subject: Motion for Appellate Review**
>
> **Please note that Malhan has filed motion for leave to appeal.**

98.   Attached in the body of the email was a copy of the electronic notice generated by the appellate division e-filing system which stated:

> NOTICE HAS BEEN ELECTRONICALLY MAILED TO:
> APPELLANT
> …
> ROBERT B KORNITZER [email omitted]
> LAURENCE J CUTLER [email omitted]
> TRIAL COURT JUDGE: DONALD A. KESSLER, JSC

99.   Under New Jersey's electronic filing system the motion of leave to appeal is filed electronically with e-notice sent to the trial court through the filing system.

100.   The 2013 Supreme Court "NOTICE TO THE BAR Electronic Filing in the Appellate Division ('eDATA'}" Paragraph 8 provides:

> 8. Notice to trial judge or agency. Rule 2:5-1(b) is relaxed for appeals filed via the eDATA system so as to provide that copies of the Notice of Appeal and Case Information Statement, and all related documents, shall be forwarded by the Clerk to the trial judge via email that provides a link to the documents

101.   Under New Jersey Court rule 2:5-1(b), when an appeal or motion for leave to appeal is filed the trial judge is permitted to submit supplemental reasons to the Appellate Division:

> Within 15 days thereafter [filing], the trial judge, agency or officer, may file and mail to the parties an amplification of a prior statement, opinion or memorandum made either in writing or orally and recorded pursuant to R. 1:2-2.   If there is no such prior statement, opinion or memorandum, the trial judge, agency or officer shall within such time file with the Clerk of the Appellate Division and  mail to the parties a written opinion stating findings of fact and conclusions of law.

102.   Judge Kessler submitted a letter to the Appellate Division dated September 6, 2017 but it does not comply with Rule 2:5-1 as it did not attempt to amplify the reasons for ordering the Garnishment but only tried to explain why Judge Kessler had not decided to reconsider the Order.

103.   Judge Kessler's Letter to the Appellate Division is quoted in full below:

> A motion for leave to appeal was filed by the defendant by his attorney Paul Clark.  I would have liked to have an opportunity to respond to the merits of the application. However, the motion was not sent to me until I asked for it despite the requirement that the application be sent to the trial court. Ultimately, a copy of the motion and a supporting certification were sent by email to my law clerk after several requests for a copy of the papers were requested by my chambers. I learned about the motion from the Essex County Trial Court Administrator's office. The papers sent to my chambers to the best of my knowledge did not include the transcript, an essential exhibit which is referenced in the appendix to the motion, Thus, I cannot comment on the merits other than what I have already said on the record because I need that underlying information. I will be out for the next 6 weeks and did not have time to review Court smart. Such a review would not have been necessary if I received the same papers as the appellate division.
> I want the appellate division judges to know that since December of 2016, a period of a little more than 6 months, 32 motion and cross-motions with numerous prayers for relief were filed in this matter. Additionally, I heard at least one order to show cause. Because I cannot allow one case to dominate my docket, I advised counsel that no more motions could be filed by any party without my permission. Mr. Clark asked to file a motion for reconsideration in this matter but I was never told why such a motion was necessary. Without knowing its basis, I was not in a position to consider allowing yet another motion in this case.
> Mr. Clark has provided reasons for his motion. However, since Mr. Clark has ordered every transcript in this case. I don't know why it was not provided to me or why I was not provided with his reasons before declining to hear the motion. Thank you for your consideration of this letter.

104.   Much of the above appears to be very confused, misleading or just false.

105.   The Judge Kessler letter quoted above, can reasonably be interpreted to mean that Judge Kessler would be willing to reconsider once he was able to review his own transcript.

106.   Clark's 7/28/17 letter to the Court asking for permission to file a motion for reconsideration described why the Garnishment Order was illegal, including quote in full 45 CFR 302.70(a) and 303.100.

107.   In light of the 7/28/17 Letter former Judge Kessler's assertion that "I was never told why such a motion was necessary" is false.

108.   Judge Kessler's Letter insists: "I would have liked to have an opportunity to respond to the merits of the application. However, the motion was not sent to me until I asked for it despite the requirement that the application be sent to the trial court."  As noted above, the motion is made available to the trial court via e-filing so this criticism is without basis.

109.   Judge Kessler's Letter insists: "Ultimately, a copy of the motion and a supporting certification were sent by email to my law clerk after several requests for a copy of the papers were requested by my chambers."

110.   In fact here is the full email chain on this issue:

> On August 28, 2017 at 3:40 PM Peter Schenke
> <peter.schenke@njcourts.gov> wrote:
> Mr. Clark:
> Please send the Court the filed application for leave to appeal. The
> Court is not in receipt of the application at this time.
>
> ---------------------------
> From: Paul Clark [pclark@pclarklegal.com]
> Sent: Monday, August 28, 2017 4:19 PM
> To: Peter Schenke peter.schenke@njcourts.gov …
> Subject: RE: Motion for Appellate Review
> All:
> I understand the trial court is provided all filing in electronic format,
> but I can provide a further copy to the court. Please advise if you wish
> me to send by email or mail a paper copy.
> Paul Clark

----------------------------------
On August 28, 2017 at 4:20 PM Peter Schenke
<peter.schenke@njcourts.gov> wrote:
Mr. Clark:
**Thank you for the timely response**. Can you please send by email?
Thank you in advance.
Best Regards,
Pete

----------------------------------
From: Paul Clark [mailto:pclark@pclarklegal.com]
Sent: Monday, August 28, 2017 4:36 PM
To: Peter Schenke peter.schenke@njcourts.gov … Adam Soloperto <
adam.soloperto@njcourts.gov>
Subject: RE: Motion for Appellate Review
Motion papers are attached minus exhibits.
Paul Clark

111.   The first and only time the Court asked Malhan or Clark to provide a copy of
the papers was On August 28, 2017 at 3:40 PM.

112.   As seen above, Clark responded promptly 39 minutes later:

> I understand the trial court is provided all filing in electronic format,
> but I can provide a further copy to the court. Please advise if you wish
> me to send by email or mail a paper copy.

113.   As noted above, the exhibits for the Oct 26 2016 motion (which were also
included as part of the Appendix provided with the motion) was over 1500 pages—
in fact, the Appellant's Appendix was nine volumes.

114.   The Judge Kessler's Court clerk responded "**Thank you for the timely
response**. Can you please send by email?"

115.   Clark responded 16 minutes later: "Motion papers are attached minus
exhibits."

116.   There was no further request for exhibits from the trial court.

117.   Judge Kessler's assertion to the Appellate Division that there were several requests for copies of the motion is not accurate.

118.   The transcript of the July 12, 2017 proceeding that had resulted in the August 1, 2016 Garnishment Order was ordered and uploaded to the New Jersey electronic filing system as part of the appeal on August 18, 2017.  Accordingly, a copy of the transcript of the July 12, 2017 proceeding was available to the trial court from August 18, 2017 onward.

119.   Accordingly it was without basis that Judge Kessler wrote to the Appellate Division in Sept 2017:

> Mr. Clark has provided reasons for his motion. However, since Mr. Clark has ordered every transcript in this case. I don't know why it was not provided to me or why I was not provided with his reasons before declining to hear the motion.

120.   As a further note, Clark had not "ordered every transcript in this case" nor is it clear how Judge Kessler could possibly have a basis for making such an assertion.

121.   As of the filing of the filing of the initial suit in this case ECF # 1, SpaceAge had not received any garnishment notice from Essex County or Hudson County probation (but a Notice was eventually received in December 2019).

122.   Because this action by Judge Kessler was sua sponte, Malhan had not briefed the issue of garnishment nor had Malhan provided any recent pay information—although Malhan had provided substantial financial information from 2016 when he initially filed the motion nine months earlier.

123.   Malhan had actually received a total net salary (or disposable income as defined by applicable statutes) for all of 2017 of $54,568.10.

124.   The family court also stated on the record that because garnishment would take time the Court in lieu of garnishment would order Malhan to make a cash payment of $4000.

125.   This $4000 cash payment appears to have been designed to circumvent the notice provisions and other protections found in 45 CFR 303.100 which must be followed prior to any wage garnishment.

126.   In September 2017 Malhan and SpaceAge lodged a complaint with the United States Department of Labor that the garnishment order violated federal law.

127.   Specifically, in early September 2017 Malhan's Counsel (Clark) telephoned the DOL regional office to explain the situation and see if they could help.

128.   Clark eventually spoke with Mirella Deligi who asked Clark to have Malhan send a letter signed by him to the Department of Labor to the email address, deligi.mirella@dol.gov.

129.   On September 13, 2017 Malhan sent a 5 page letter explaining the situation.to the Department of Labor attaching his pay stubs and a copy of the Garnishment Order.

130.   On October 25, 2017 the U.S. Dept of Labor Office of the Solicitor (signed by Michael Hartman) sent a letter to Judge Kessler stating that the Court's demand for a $4000 per month garnishment was in violation of federal law.

131.   Judge Kessler later stated that he had not received this letter.

132.   In an proceeding on the Record February 28, 2018 Judge Kessler ruled that he was vacating the Garnishment Order, in light of the DOL letter, however remarkably, Judge Kessler insisted that the Garnishment Order was not illegal it was just "mislabeled."

133.   The following is part of the transcript of a remarkable proceeding:

> THE COURT: I may have made a mistake as to the quantum of his wages and, as I said, maybe it was mischaracterized as a wage garnishment order and should not have been so characterized. And I -- I'll -- I'll concede that.
>
> MR. CLARK: Okay, so -- so that order was illegal. …
>
> THE COURT: It was probably -- it was – I wouldn't take the view it's illegal, Mr. Clark. I would take the view that it was –

> MR. CLARK: Contrary to federal --
>
> THE COURT: -- that --
>
> MR. CLARK: -- law.
>
> THE COURT: -- it --
>
> MS. JULIAN [Myronova counsel]: Jesus Christ [sic].
>
> THE COURT: -- it was improperly labeled.

Feb 28, 2018  Tr. 66:9-67:4

134.    Since the Court vacated the Order but refused to acknowledge that the Order was illegal Malhan remains at risk that such an Order could be renewed by another judge.

135.    Moreover, on February 28, 2018 the family court, despite vacating the illegal order which Judge Kessler insisted was not illegal, issued a new order stating:

> 1.  Defendant [Malhan] is found to be in violation of litigants rights for his failure to pay Plaintiff Spousal and Child Support Arrears in the amount of $4,000 per month ($3000 towards child support and $1000 towards spousal support arrears), ~~in accordance with paragraph 1 of the August 1, 2017 Wage Garnishment Order~~ in accordance with the purpose of paragraph 19 of the August 1, 2017 Order.  …
> 3.  Defendant is hereby sanctioned in accordance with R. 1:10-3 in the amount to be determined appropriate by the Court by the payment of counsel fees.  The application for counsel fees shall be limited to enforcement of child support.

Court Order Feb 28, 2018

136.    In the Feb 28 Order the words "in accordance with paragraph 1 of the August 1, 2017 Wage Garnishment Order" are crossed out and "in accordance with the purpose of" were written in.

137.    In other words, on February 28, 2017 the Court per Judge Kessler found Malhan to be in violation of litigants rights for failing to comply with "the

purpose" of the August 1 2017 Garnishment Order that the DOL had determined was a illegal as a violation of federal law.

138.   In an Order dated March 29, 2019, the Court per Judge Kessler ultimately sanctioned Malhan $9,231.12 as the amount left open as part of the Feb 28 Order.

139.   In a separate order also dated Feb 28, 2019, the Court per Judge Kessler Ordered: "All Garnishment Orders that apply to Malhan are VACATED."

140.   The Court in holding Malhan in violation of litigants' rights for failing to pay child support and spousal support, refused to consider whether Malhan actually owed any such support, Judge Kessler simply accepted the figure provided by Probation as unassailably truth without any opportunity to rebut it.

141.   Another important issue that arose at the February 28, 2018 proceeding was that Judge Kessler stated that he had not received nor been informed of the October 2017 Dept of Labor Letter addressed to him:

> THE COURT: I took the liberty of printing out the probation report on arrearages since the payments are made through probation. …
> So let me first address the child support order that this Court entered as a -- as a wage garnishment order on August 1, 2017. Mr. Clark has argued that the Court did not have the authority to enter this order and attaches a letter, which apparently was sent to this Court and until I saw this motion, I was never aware of it.  …  So the letter is dated October 25, 2017.  Now, I'm not aware of this letter. I'm not aware of it coming to my chambers. No one in my chambers ever brought it to my attention and I'll just point out that it was sent to the first floor and not to this floor and maybe it went to the wrong hands, but I never saw it. Also indicate for the record that the Court was out on disability at that point in time, so I was not aware of that letter.
> But having said that, it -- it's pretty clear, Mr. Clark, that this letter was precipitated by something that you wrote or corresponded with the United States Department of Labor. Did you send them a letter?
> MR. CLARK: Yes, Your Honor, because they are the federal --
> THE COURT: Why is that letter not attached to the papers?

Tr. 42:4-43:16.

142.   As can be seen starting in the last few lines quoted above, and can be verified from the tone of Judge Kessler voice in the audio recording of the

proceeding, Judge Kessler was angry and offended that Malhan and his counsel had dared to "go over his head" to the United States Dep't of Labor.

143.   The transcript from February 28, 2018 continues:

> THE COURT: Why is that letter not attached to the papers?
> MR. CLARK: Oh, I'm sorry. I -- you asked if I sent them a letter. I'm not actually sure I sent them a letter. I certainly --
> THE COURT: Well, --
> MR. CLARK: -- discussed it with them. I apologize. I wasn't being specifically accurate, but I thought what Your Honor was asking is did we contact --
> THE COURT:  [angrily] Well, you know, I'll -- I'm going to find out, Mr. Clark.

144.   As described above, Clark initially contacted the DOL by telephone and then Malhan sent a letter over his signature attaching the Order and pay stubs.

145.   At the February proceeding quoted just above it was apparent that Judge Kessler was trying to be hyper-techincal, and thus Clark responded with might also seem hyper-technical that "we contact[ed]" DOL that "I [Clark] certainly discussed it with them" but that Clark was "not sure" whether "I [Clark] sent a letter.

146.   Judge Kessler went on to angrily accuse Malhan's counsel of misconduct (the section is quite long and only some of the highlights are quoted below):

> THE COURT: If there's a letter, I, you know, I should have been given the letter. I certainly should have been told the circumstances that brought this about. And -- and I can't imagine it was brought orally when it references disposable income of the -- in the amount of $54,568.10, which is at variance with the case information statement which says $60,000.  Now, I -- I -- I realize that some of that includes rent, but that number was inaccurate. And where would they have gotten that number, that precise number from, if they didn't get it --
> MR. CLARK: Well, we --
> THE COURT: -- from you? And I --
> MR. CLARK: -- we -- we did --
> THE COURT: -- and I can't imagine that they didn't get it in writing.
> MR. CLARK: Well, we did provide them the pay stubs. So, again, I'm just --
> THE COURT: Well, then you had --

MR. CLARK: -- trying --

THE COURT: -- then that's something you sent to them. Mr. Clark, that's my point. Whatever you sent --

MR. CLARK: Okay.

THE COURT: -- to them, and -- and the circumstances under which this, you know, what – what you essentially -- the way this -- these papers are presented is that, you know, the -- **this Court got a letter from the US Department of Labor admonishing his conduct** [emphasis added].

MR. CLARK: Well, I don't describe the letter, but the Department of Labor is --

THE COURT: Okay.

MR. CLARK: -- the agency that is – is statutorily authorized --

THE COURT: I understand --

MR. CLARK: Okay.

THE COURT: -- all that, Mr. Clark. You -- you know, you -- you -- again, you're not being direct with the Court. I asked --

MR. CLARK: Well, I don't know --

THE COURT: -- I asked a direct --

MR. CLARK: -- how I can be --

THE COURT: -- question. You know, I wanted a direct answer to the question, which was whether you put something together in writing? But not disclosing to the Court, particularly to Judge Katz because this was supposed to go to Judge Katz, and this is something that -- that the -- the Court is disturbed about. You know, if you're going to present this to another judge, then you should at least tell him the circumstances under which this letter was generated. And certainly even if it was me, you should have told me that, but particularly to go to Judge Katz with this is, especially in my mind, egregious.

MR. CLARK: Well, obviously, I disagree, Your Honor.

THE COURT:  [angrily] You know, you always -- Mr. Clark, very rarely do you agree and whether you disagree or not, I think as an officer of this court, you have certain obligations.

MR. CLARK: Well, my obligation is to --

THE COURT: Your obligation --

MR. CLARK: -- point out that this was --

THE COURT: -- one of your fundamental obligations is to be truthful and, you know, and – and truth has two elements to it. Truth is you could be affirmatively untruthful or you could be untruthful by omission by omitting material facts. And you didn't present the entire situation, so you omitted those facts in presenting this to the Court.

MR. CLARK: Well, I disagree we omitted it, Your Honor. The important thing is that this Court --

THE COURT: [angrily] Mr. Clark, I'm not interested in your disagreements. I'm telling you what you did. And the fact of the matter is that you have no remorse about it and you can't seem to comprehend it is something that is somewhat troubling to this Court.

MR. CLARK: Well, the -- the troubling part of this particular issue is that Your Honor entered ex parte what was called a garnishment order. There was no notice --

THE COURT: I didn't enter it ex parte. You were here.

MR. CLARK: Well, part of the order was ex parte I should say. You -- you -- you added some things I think afterwards, …  Well, what -- what I should have said actually is you entered the order sua sponte, but I think there actually were some ex parte additions after -- after the hearing. But Your Honor brought up this issue of garnishment you -- without notice to Mr. Malhan, without notice to anyone. You decided to enter this order. You didn't have –

THE COURT: Well, that's within -- that's something within the Court's inhered powers in -- in -- in child support cases that -- that we have the rights to enforce them. And if that's the way I decide to enforce it, I have every right to do it. That's not bringing up sua sponte. …

MR. CLARK: Well, it's still sua sponte.   Mr. Kornitzer [Myronova counsel] didn't ask for it. Your Honor asked for it. You didn't have the -- the correct information in front of the Court and you entered the order. We asked your order -- we pointed out in a letter to Your Honor that we believed this order was illegal, that it was -- it violated federal law. Your Honor didn't respond to that. I understand you're not required to. And then the --

THE COURT: And you took it to the Appellate Division --

MR. CLARK: We -- we took it --

THE COURT: -- and they did -- they also chose not to hear it.

MR. CLARK: They -- they chose not to hear it. They apparently thought that Your Honor may be willing to reconsider or something. But in any case--

THE COURT: Where did you get that idea from?

MR. CLARK: Because Your Honor wrote them a letter --

THE COURT: They -- they knew I -- they knew I refused to reconsider it.

MR. CLARK: Your Honor wrote them a letter that was faxed that is part of the Appellate Record …

THE COURT: -- [I]s my letter attached here, Mr. Clark.

MR. CLARK: I don't believe it is, Your Honor. But it --
THE COURT: I -- I -- I don't believe that's what my letter said, but I
don't have it in front of me right now.
MR. CLARK: Okay, so in any case, Your Honor, obviously, what
SpaceAge did is we did all the appropriate things. We believed the
order was illegal.  We brought it to Your Honor's attention, we
brought it to the Appellate Court's attention, we brought it to the
Federal government's attention. And the Federal government did --
did enforce this Federal law, agreed with us. So, you know, --
THE COURT: Well, let me tell you, Mr. – the -- the one thing, and
what they said is they don't know the facts of this case.

Tr. 44:2-50:24

147.   From the above angry statements of Judge Kessler it is clear that he was
very upset that Malhan had dared to exercise his rights to seek review from higher
levels of government.

148.   On or about May 1, 2018 Malhan filed a motion to disqualify Judge Kessler
based on a variety of factors including that Judge Kessler had repeatedly, angrily
berated Malhan's counsel.

149.   Judge Kessler granted the motion for disqualification and recused himself
(but without any explanation or statement of reasons) by a written order dated June
8, 2018.

150.   After Judge Kessler recused himself Judge Katz (who had already been
involved in the case as presiding judge) took over.

151.   In light of the fact that Malhan's motion to disqualify Judge Kessler for bias
was essentially granted, Malhan asked that Judge Kessler's Order sanctioning
Malhan $9,231.12 should be reviewed de novo, but Judge Katz refused.

152.   Malhan's business revenue and salary from SpaceAge continued to decline
and in 2019 Malhan received just $10,000 a total net salary (or disposable income)
disposable income for all of 2019, in addition to a modest amount of rental money
that is not salary.

153.    In late 2018 and in the Summer of 2019 the Court ordered some of Malhan's properties to be sold to pay alleged child support—as before the family court merely accepted probation figure as unassailably true and did not permit Malhan to challenge the accuracy of the debt or recalculate child support.

154.    In the Summer of 2019, Malhan's debt according to probation was effectively wiped out due to the sale of his properties, however, Malhan was expected to continue paying $3000 per month going forward.

155.    Malhan did not have income in 2019 to pay $3000 per month in child support.

156.    In late 2019 NJ Probation again began to insist that Malhan owed child support.

157.    In early December 2019, in a letter dated 11/29/2019 Essex Probation sent what is called "Income Withholding Order/Notice of Support" to Malhan's company SpaceAge demanding that SpaceAge garnish Malhan's pay $7000 per month.

158.    There was no month in 2019 that Malhan was paid $7000, so the 11/29/19 Notice effectively seeks to garnish 100% of Malhan's wages.

159.    As of the filing of this Amended Complaint no trial in the Family Court case is still not concluded

**July 2018 Bank Levy**

160.    As described above in 2016 New Jersey sent Malhan noticed for levy included $16,500 in tenant security deposits, Malhan held in trust for his tenants.

161.    At the same hearing in Febriary 2017 when Judge Kessler made the coment that "Mr. Malhan has four overnights a week …  And for a considerable point of time, he's 24 had it appears to me primary custody" Malhan explained to the Court that the landlord tenant accounts had been levied by New Jersey."

162.    Malhan asked the court to issue and order that the specific landlord tenant account ending on 5056 would not be subject to levy.

163.   Judge Kessler appeared to agree stating on the record: "I'm not going to blind-side Mr. Kornitzer [Myronova's new counsel who had justr recently been hired to replace her prior counsel] today. This is a lot for him to absorb. But my inclination is if it's trustee money, Mr. Kornitzer, that belongs to third parties, it can't be levied."

164.   On the 14th of February 2017 the Court per Judge Kessler entered and Order that read:

> IT IS on this 14th day of February, 2017 hereby ORDERED:
>
> 1. The child support levy in the bank account ending in 5056 at Bank of America is stayed pending further order of the Court.

165.   This order is not as strong as Malhan wished, instead of statng that the account is not subject to levy it only explicitly stated the then existing levy was stayed.

166.   In July 2018 again levied Malhan's bank accounts for $15,907.16 which was tenant accounts from account ending in 5056 at BOA.

167.   Malhan received notice from Bank of America that they had mailed a check to State New Jersey for $15,907.16 which was cashed on July 23, 2018.

168.   Despite the check being cashed, Malhan never received any credit for any of the $15,907.16 which was cashed on July 23, 2018.

169.   For a long period of time the $15,907.16 which was listed as simply "pending."

170.   Malhan repeatedly contacted New Jersey Probation to ask why his theoretical child support obligation has not been credited for $15,907.16.

171.   Bank of America tells Malhan that New Jersey has the money and he must speak to them.

172.   New Jersey probation has told Malhan that they do not have the money and cannot do anything to locate it.

173.   Most recently on December 19, 2019 Malhan called Essex County Probation to inquire about the $15,907.16 and was told "we can't do anything … there's nothing we can do."  They told him to talk to BOA.

174.   Malhan stated that he had proof from his bank that the check had been cashed so clearly he should get credit for the money but Probation insisted that they had no record and that was the end of the story.

175.   When Malhan explained that the bank says talk to the state but probation says talk to the bank, and Malhan insisted that they do an investigation the "customer service" person identified as Daishe said she would not talk to him any more and hung up.

176.   As of the filing of this complaint in December 2019, Malhan has not received any credit for the $15,907.16 which was taken and the state is once again claiming he owes child support (but far less than $15,907.16).

177.   Malhan again faces seizure of his bank account, potential imprisonment, loss of licenses, loss of passport for an alleged debt that does not exist and which New Jersey does not permit him to meaningfully contest.


## COUNT I

## RETALITION

178.   Malhan restates the above paragraphs as fully contained in this section.

179.   Malhan's report to the U.S. Dep't of Labor that Judge Donald Kessler had violated federal law was protected conduct under the First and Fourteenth Amendments and federal law.

180.   Then Judge Donald Kessler was visibly and audibly furious at Malhan and his counsel for taking the illegal order to the federal government.

181.   Then Judge Kessler refused to admit that the order was illegal despite agreeing to vacate the Order.

182. Then Judge Kessler took personal offense as reflected by his comment: "this Court got a letter from the US Department of Labor admonishing his conduct."

183. Then Judge Kessler then "fined" Malhan $9,231.12 in large part for Malhan's refusal to comply with an illegal order and for filing a complaint with the U.S.D.O.L.

184. During the same time period then Judge Kessler was also the defendant in a suit pending in federal district court with respect to a Gag Order issued by then Judge Kessler. 2:18-cv-00963 (D.N.J.)

185. Then Judge Kessler's comments were so biased that he even recused himself a few months after the February 28, 2018 proceeding.

186. When this information was brought to the attention of the new judge David Katz he refused to vacate any of Judge Kessler's orders

187. The above actions constitutes illegal retaliation for Malhan filing a meritorious complaint with the U.S. DOL and filing suit against Judge Kessler for issuing a Gag Order against Malhan.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

    a.    Declare under the Declaratory Judgment Act that it is illegal for a person to be sanction of held in violation of litigants rights for refusing to comply with a court order that violates federal law;

    b.    b.    Preliminarily and permanently enjoin State Defendants from enforcing the Malhan $9,231.12 sanction;

    c.    Award Malhan damages of $9,231.12 plus pre-judgment interest and punitive damages against former Judge Kessler and John Does;

    d.    Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

    e.    Award Plaintiff other and further relief as the Court deems just and proper.

## COUNT II

### Violation of Section 42 USC §669a by State Defendants Unlawfully Causing the Disclosure of Confidential Bank Records and Levy of Bank Account to satisfy alleged Spousal Support

188.    Malhan restates the above paragraphs as fully contained in this section.

189.    As described above, Malhan has had physical custody of his children 54% of the time since 2012 and thus qualifies as a custodial parent under state or federal law. N.J. Stat.  § 2A:17-56.52.

190.    The Child Support Enforcement Act, 42 USC §669a, only permits state enforcement agencies to require reports of bank accounts for noncustodial parents.

191.    Child Support Enforcement Act,  42 USC §669a subsection c provides for a federal cause of action against state officers or employees who negligently cause the disclosure of a financial record in violation of CSEA:

    (c) Civil damages for unauthorized disclosure
    (1) Disclosure by State officer or employee

    If any person knowingly, or by reason of negligence, discloses a financial record of an individual in violation of subsection (b) of this section, such individual may bring a civil action for damages against such person in a district court of the United States.

Emphasis Added.

192.     Subsection b in turn provides:

(b) Prohibition of disclosure of financial record obtained by State child support enforcement agency

A State child support enforcement agency which obtains a financial record of an individual from a financial institution <u>pursuant to subsection (a)</u> of this section may disclose such financial record <u>only for the purpose of, and to the extent necessary in, establishing, modifying, or enforcing a child support obligation</u> of such individual.

Emphasis Added.

193.     "[S]uch individual" as used in subsections a and b above refers to a non-custodial parent as 42 USC 666(a)(17)(A) makes clear.

194.     Subsection a in turn provides:

Notwithstanding any other provision of Federal or State law, a financial institution shall not be liable under any Federal or State law to any person for disclosing any financial record of an individual to a State child support enforcement agency attempting to establish, modify, or enforce a child support obligation of such individual, or for disclosing any such record to the Federal Parent Locator Service pursuant to section 666(a)(17)(A) of this title.

195.     Finally, 42 USC 666(a)(17)(A) provides

(17) Financial institution data matches.—

(A) In general.—Procedures under which the State agency shall enter into agreements with financial institutions doing business in the State—

(i) to develop and operate, in coordination with such financial institutions, and the Federal Parent Locator Service in the case of financial institutions doing business in two or more States, a data match system, using automated data exchanges to the maximum extent feasible, in which each such financial institution is required to provide for each calendar quarter the name, record address, social security number or other taxpayer identification number, and other identifying information for each <u>noncustodial</u> parent who maintains an account at such institution and who owes past-due support, as identified by

the State by name and social security number or other taxpayer identification number; and

(ii) in response to a notice of lien or levy, encumber or surrender, as the case may be, assets held by such institution on behalf of any <u>noncustodial</u> parent who is subject to a child support lien pursuant to paragraph (4).

Emphasis Added.

196.    In other words, state agencies are only authorized to obtain financial information for a "noncustodial parent … who owes past due support."   The repeated emphasis on noncustodial parent is not accidental.

197.    The "Child Support Enforcement Act" begins with section 651 "Authorization of appropriations") which explains:

> For the purpose of enforcing the support obligations owed by <u>noncustodial</u> parents to their children and the spouse (or former spouse) with whom such children are living, locating <u>noncustodial</u> parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for assistance under a State program funded under part A of this subchapter) for whom such assistance is requested, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part.

Emphasis Added.

198.    The use of the term noncustodial parent is deliberate.  The notes to this section state that "Pub. L. 104–193, §395(d)(1)(A), substituted 'noncustodial' for 'absent' in two places."

199.    The next section §652 ("Duties of Secretary") begins:

(a) Establishment of separate organizational unit; duties

The Secretary shall establish, within the Department of Health and Human Services a separate organizational unit, under the direction of a designee of the Secretary, who shall report directly to the Secretary and who shall—

(1) establish such standards for State programs for locating <u>noncustodial</u> parents, establishing paternity, and obtaining child support and support for

the spouse (or former spouse) with whom the <u>noncustodial</u> parent's child is living as he determines to be necessary to assure that such programs will be effective; …

(8) receive applications from States for permission to utilize the courts of the United States to enforce court orders for support against <u>noncustodial</u> parents and, upon a finding that (A) another State has not undertaken to enforce the court order of the originating State against the <u>noncustodial</u> parent within a reasonable time, and (B) that utilization of the Federal courts is the only reasonable method of enforcing such order, approve such applications;

Emphasis Added.

200.    Section §654b ("Collection and disbursement of support payments") mandates that states do a number of things, including:

(4) to furnish to <u>any parent</u>, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent, except that in cases described in subsection (a)(1)(B) of this section, the State disbursement unit shall not be required to convert and maintain in automated form records of payments kept pursuant to section 666(a)(8)(B)(iii) of this title before the effective date of this section.

Emphasis Added.

201.   Clearly, Congress knew how to distinguish between custodial parents, noncustodial parents and parents generally.  Therefore, when Congress specifies that an action may only be taken with respect to a noncustodial parent Congress means it.

202.    Moreover, there is a good reason for such a limitation.  When, as in this case for example, a parent who used to be a non-custodial parent becomes the custodial parent, it would not make sense to seize the funds of the custodial parent to pay the noncustodial parent.  Even if there were a technical overdue debt of the noncustodial parent to the now non-custodial parent, seizing the funds of the

custodial parent might well simply harm the children for whom the custodial parent may not be able to feed cloth or house.

203.    Accordingly, not only does the statute (42 USC 666(a)(17)(A)) clearly restrict levies to accounts of noncustodial parents, but any other interpretation would lead to absurd results.

204.    Further, section 666(a)(4) explicitly states that under the Act the lien procedure is limited to actions against noncustodial parents:

> (a) Types of procedures required
> (4) Liens.—Procedures under which—
> (A) liens arise by operation of law against real and personal property for amounts of overdue support owed by a <u>noncustodial</u> parent who resides or owns property in the State[.]

Emphasis added.

205.    In the instant case, Malhan was the custodial parent.  In 2011 when child support was first calculated Malhan's wife had full legal and physical custody, however in June 2012 Malhan obtained joint legal custody and since then he has had 54% of overnights with his two children.    Court Orders.

206.    Although (surprisingly) CSEA does not define noncustodial parent,  N.J. Stat.  § 2A:17-56.52 provides:

> "Custodial parent" means the parent or other person who has legal and physical custody of a child for the majority of the time. The custodial parent is responsible for the day-to-day decisions related to the child and for providing the basic needs of the child on a daily basis. The custodial parent is the person to whom child support is payable. In shared parenting situations, the custodial parent is known as the Parent of Primary Residence.
> …
> "Non-custodial parent" means the parent who does not have physical custody of the child on a day-to-day basis. In shared parenting situations, the non-custodial parent is known as the Parent of Alternate Residence.

207.    See also 26 U.S.C.A. § 152 which provides:

> (4) Custodial parent and noncustodial parent.--For purposes of this subsection--

(A) Custodial parent.--The term "custodial parent" means the parent having custody for the greater portion of the calendar year.
(B) Noncustodial parent.--The term "noncustodial parent" means the parent who is not the custodial parent.

208.    Malhan is the custodial parent, but the state officers John Does 1 through 10 have improperly caused the disclosure of the records of a custodial parent in violation of CSEA and are liable for damages irregardless of their status as state officers.

209.    Furthermore, State Defendants simply lump together alleged spousal and child support owed.  The Notice of Levy states that Malhan owes "$ 46.354.07 in past due child support arrears."  Notice of Levy 11/1/2016, attached to **ECF # 1** as **Exhibit 1**.

210.   Although the Notice of Levy lists this amount as Child Support it is clear that some portion of this was actually spousal support.  **Exhibit 2 to ECF #1** showing that spousal support is included in this total support obligation.

211.   Section 666 generally only permits levy of accounts to satisfy child support not spousal support.  Section 666(e) provides

> (e) "Overdue support" defined
> For purposes of this section, the term "overdue support" means the amount of a delinquency pursuant to an obligation determined under a court order, or an order of an administrative process established under State law, for support and maintenance of a minor child which is owed to or <u>on behalf of such child, or for support and maintenance of the noncustodial parent's spouse (or former spouse) with whom the child is living if and to the extent that spousal support (with respect to such spouse or former spouse) would be included for purposes of section 654(4) of this title.</u>

Emphasis added.

212.    Section 654(4) provides, in full:

> A State plan for child and spousal support must—

…

(4) provide that the State will—

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to—

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX of this chapter, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child; and

(B) enforce any support obligation established with respect to—

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

213.    Thus section 654(4) appears to only apply to the custodial parents of children receiving aid under a state plan—neither of which (being custodian or receiving aid) is applicable in this case.

214.   By lumping together child support and spousal support in one indistinguishable account, the Defendants illegally are attempting to collect spousal support (allegedly owed) through a levy which is only permitted to collect child support.

215.   By freezing Malhan's Bank account for several weeks, Defendants have caused damages to Malhan including infliction of mental anguish and emotional distress, as well as some financial injury brought about by the need to make alternative arrangement to pay bills such as mortgages.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a.      Declare under the Declaratory Judgment Act that 42 USC 666(a)(17)(A) and 42 USC §669a prohibit the release or reporting of financial information of custodial parents;

b.      Preliminarily and permanently enjoin state defendants from seeking financial information of Malhan from any financial institution so long as he is a custodial parent,

c.      Ordering state defendants to release any hold on Malhan funds which has resulted from the illegal reporting of the account information of Malhan as a custodial parent, if applicable.

d.      Preliminarily and permanently enjoin state defendants from seeking forfeiture of any funds which are in jeopardy as a result of the illegal reporting of the account information of Malhan as a custodial parent

e.      Declare under the Declaratory Judgment Act that the CSEA does not permit levy of bank accounts to seize funds alleged to be owed for spousal support;

f.      Preliminarily and permanently enjoin state defendants from levying a bank account to satisfy alleged debts for spousal support

g.      Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

h.      Award Plaintiff other and further relief as the Court deems just and proper.


**COUNT III**

**Declaratory Relief that State Agency and State Defendants are in violation of 42 USC 666(a)(10) by reason of the State's refusal to review and adjust Child Support Order for more than five years**

216.        Malhan restates the above paragraphs as fully contained in this section.

217.        On April 1, 2011 when child support was set Malhan had 0% custody and Myronova had a salary of $0.

218.   Malhan now has 54% of overnights and Myronova has a salary of over $110,000 not counting spousal or child support or cohabitation.  Malhan's financial situation has deteriorated, including payment of $92,000 in IRS payments which depleted his savings.

219.    Malhan has repeatedly asked the Court to review and adjust child support but the state of New Jersey has failed to review or adjust child support.

220.   On December 13, 2019 in response to Probation demand for Garnishment Malhan submitted a request for triennial review to the State of New Jersey but there has been no response and there has been no review.

221.   The December 13 form was faxed again on December 19, because the fax on December 13 was unable to print a confirmation.

222.    On October 7, 2019 Malhan submitted a request for triennial review to the State of New Jersey but there has been no response and there has been no review.

223.    Malhan a request for triennial review to the State on May 28, 2019, but there was no response and no triennial review was performed.

224.    Malhan a request for triennial review to the State in December 2018, but there was no response and no triennial review was performed.

225.    Malhan a request for triennial review to the State in October 2018, but there was no response and no triennial review was performed.

226.   On or about January 5, 2017 Malhan submitted an official request to the State for a triennial review of the child support amount including providing hundreds of pages of financial information for himself and his estranged wife.

227.   On or about February 7, 2017 the request for a triennial review was officially rejected with the notation that there was "No Response to the Triennial Review Financial Request."

228.   When Malhan followed up to ask about the notice he was told that Malhan's estranged wife had failed to respond to a request for financial information so no triennial review would be conducted.

229.   Malhan was told that it was the policy of New Jersey not to do a triennial review unless the person listed as the obligee requested it, and since Malhan was the obligor, no review would be conducted.

230.   Malhan first amended the complaint in the instant suit over this issue of triennial review in early 2017 so the State for more than two years has been aware of and approved of this policy of not performing triennial reviews.

231.   U.S. Code title 42 section 666(a)(10) requires State under CSEA to have a procedure to review and adjust support orders at least every three years or upon request and showing that existing support does not comport with established Guidelines:

> (a) Types of procedures required
>
> In order to satisfy section 654(20)(A) of this title, each State must have in effect laws requiring the use of the following procedures, consistent with this section and with regulations of the Secretary, to increase the effectiveness of the program which the State administers under this part:
>
> …
>
> (10) Review and adjustment of support orders upon request.—
>
> (A) 3-year cycle.—
>
> (i) In general.—Procedures under which every 3 years (or such shorter cycle as the State may determine), upon the request of either parent or if there is an assignment under part A of this subchapter, the State shall with respect to a support order being enforced under this part, taking into account the best interests of the child involved—

(I)     review and, if appropriate, adjust the order in accordance with the guidelines established pursuant to section 667(a) of this title if the amount of the child support award under the order differs from the amount that would be awarded in accordance with the guidelines[.]

Emphasis added.

232.        Section 654 provides

A State plan for child and spousal support must— …

(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

233.        Section 667(a) provides

§667. State guidelines for child support awards
(a) Establishment of guidelines; method

Each State, as a condition for having its State plan approved under this part, must establish guidelines for child support award amounts within the State. The guidelines may be established by law or by judicial or administrative action, and shall be reviewed at least once every 4 years to ensure that their application results in the determination of appropriate child support award amounts.

234.        Section 666(a)(10) explicitly provides that "either parent" (that is, the obligor or obligee, the custodial or the noncustodial parent) may seek review which at the longest shall be no more than three years.  The statute provides no exceptions.  The statute does not make the interests of the child determinative but requires the state to consider the best interests of the children.  Where, as here, the custodial parent is in danger of financial distress which could make it more difficult to care for the children, such a review is plainly required.

235.   Despite the fact that Myronova earns a salary of over $110,000 (exclusive of child or spousal support) she has never been required to contribute even $1 for child support and because there has been no recalculation since 2011 (when her salary was $0) her salary is still considered to be $0 by State Defendants.

236.   By failing to review and adjust the child support awards, the State of New Jersey and state defendant are in violation of 42 §§ 654, 666 and 667.

237.   The Child Support Enforcement Act mandates that State ensure that both parents contribute to child support; by failing to recalculate support when one parent earns over $110,000 the State Defendants are violating the Child Support Enforcement Act to the detriment of Malhan's minor children V.M and E.M.

## Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a.     Declare under the Declaratory Judgment Act that by failing to review and adjust the child support awards, the State of New Jersey and state defendant are in violation of 42 U.S.C. §§ 654, 666 and 667.

b.     Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c.     Award Plaintiff other and further relief as the Court deems just and proper.

## COUNT IV

### Injunctive Relief pursuant to 42 USC § 1984 that State Defendants have violated Malhan's and V.M and E.M's right to Recalculation of support provided for under 42 USC 666(a)(10)

238.   Malhan restates the above paragraphs as fully contained in this section.

239.   The provision found in 42 USC 666(a)(10) that a State must review and adjust support orders upon request of either parent establishes an affirmative right to such review under federal law.

240. By refusing to review and adjust child support despite repeated requests, clear change of circumstances and after more than five years, state defendants have violated Malhan's right to review and adjustment under color of law.

241. Moreover, by freezing his bank account and seeking to levy his bank account without conducting a review and adjustment Malhan has already suffered deprivation of property as a direct result of this violation of his rights.

242. Despite the fact that Myronova earns a salary of over $110,000 (exclusive of child or spousal support) she has never been required to contribute even $1 for child support and because there has been no recalculation since 2011 (when her salary was $0) her salary is still considered to be $0 by State Defendants.

243. This failure to recalculate support based on a substantial increase in income violates the rights of Malhan and his minor children which are guaranteed by of 42 §§ 654, 666 and 667.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

    a.    Enjoin any further violation of Malhan's rights and seizure of his property by failing to review and adjust the child support awards in violation of 42 U.S.C. §§ 654, 666 and 667.

    b.    Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

    c.    Award Plaintiff other and further relief as the Court deems just and proper.

## COUNT V

**Declaratory Relief that State Defendants have denied Malhan Due Process under Color of Law by refusing to permit or consider counterclaims and offsets to the alleged child or spousal support**

244. Malhan restates the above paragraphs as fully contained in this section.

245.   The New Jersey court has already ruled that Myronova improperly obtained $22,000 from Malhan in 2011 to 2012, of which approximately $3,000 was repaid, leaving at least a $19,000 debt, excluding interest.

246.   In 2013 the New Jersey Court ruled that Malhan had overpaid spousal support by $20,000 or which only $10,000 was repaid, leaving at least $10,000 debt outstanding, exclusive of interest.

247.   In 2014 and 2015 Malhan paid over $92,000 to the IRS for the parties' joint 2010 tax return which Myronova has conceded to be a "marital" debt.

248.   The State of New Jersey thus far has refused to permit any of these debts of Myronova to be permitted to offset the alleged debt for spousal or child support.

249.   The Federal Rules of Civil Procedure permit cross claims, counter claims and offsets.  FRCP 13.  Every other U.S. jurisdiction also permits cross claims and counterclaim.  Given that these procedures are universal the right to bring a counterclaim, cross claim or offset to show that there is no real debt should be considered a basic part of due process.

250.   This due process concern is all the more important as Malhan faces seizure of property, loss of licenses and passport and even incarceration based on the allegation that he owes Myronova money when in fact it is she who owes Malhan money.

251.   For example, the State Defendants insist that Malhan owes spousal support despite the fact that a Court Order in 2013 granted Malhan a $20,000 credit. Although the Family Court also only required Myronova to repay half of that, there is no dispute that Malhan has another $10,000 credit exclusive of interest.  Yet State Defendants ignore this $10,000 credit and insist that Malhan owes spousal support.

252.   In effect, the State Defendants are refusing to permit Malhan to present evidence to contest the alleged debt, and to prove that he does not owe Myronova money; State Defendants simply ignore such "exculpatory" evidence as if it does

not exist.  Such action presents a denial of fundamental due process especially where the litigant is facing incarceration and other punitive measures.

253.   Moreover in July 2018 the state siezed $15,907.16 from Malhan's bank account and refuse to acknowledge the fact or provide him a credit.

254.   Insofar as any New Jersey law or policy permits the seizure of the person or property of Malhan without consideration of counter debts such a law or policy is unconstitutional and violated the Fourteenth Amendment to the United States' Constitution.


## COUNT VI

## Declaratory and/or Injunctive Relief against State Defendants have for illegal garnishment in violation of CSEA and

255.   Malhan restates the above paragraphs as fully contained in this section.

256.   In November 2016 Malhan also sought relief in the State family court pointing out that because he had four nights a week of custody that he was entitled at very least to significant credits, as well as that continuing to treat him as a non-custodial parent was improper.

257.   The motion referenced in the above paragraph motion was not heard by the family court for eight months.

258.   In February 2017 the family court judge stated on the record that he believed Mr. Malhan was correct that he should not be paying child support at all:

> THE COURT:      And what it really brought to my attention in a way that is much clearer to me is that Mr. Malhan has four overnights a week. And this started quite a while ago when Ms. Myronova had a boyfriend and she moved to Pompton Plains. And for a considerable point of time, he's had it appears to me primary custody.
> …
> THE COURT: Any time I've done a guidelines calculation, you know and I've done calculations, I've never done a calculation

for a parent who is not the parent of primary residence. I've done quite a few of them.

259.   Given the Court's preliminary comments that it was likely to rule in favor of Malhan made no further child support payments.

260.   At oral argument on July 13, 2017 the family court summarily denied Malhan's motion for a credit for child support (which had been pending since November 1).

261.   The Court <u>sua sponte</u> ordered that Malhan would not only resume paying $3000 per month in child support but also pay another $4000 in "arrears" payments which the Court ordered to be garnished from Malhan's salary.

262.   Although the family court had spoken about sending an order to County Probation right away, no order was entered until August 1, 2017.

263.   At the proceeding July 12, the Court stated that it would not allow the filing of any motions for reconsideration without prior permission of the court.

264.   On August 1, 2017 the family court entered two orders ordering that Malhan immediately pay $4000.

265.   Also on August 1, 2017 the family court issued a second order entieled "wage Garnishment Order" which directs that Malhan was directed to pay $4,000 on the 15th of each month, "through the Essex County Probation Department, via wage garnishment to begin on August 15, 2017" … "in addition to the required Child Support Payments ($3,000 per month)."

266.   Malhan also filed a motion with the Appellate Division for permission to file an interlocutory appeal but it was denied.

267.   Malhan had actually received a total net salary (or disposable income) disposable income for all of 2017 of $54,568.10.

268.   The family court also stated on the record that because garnishment would take time the Court in lieu of garnishment would order Malhan to make a cash payment of $4000.

269.   This $4000 cash payment appears to have been designed to circumvent the notice provisions and other protections found in 45 CFR 303.100 which must be followed prior to any wage garnishment.

270.   In September 2017 Malhan and SpaceAge lodged a complaint with the United States Department of Labor that the garnishment order violated federal law.

271.   On October 25, 2017 the U.S. Dept of Labor Office of the Solicitor (signed by Michael Hartman) sent a letter to Judge Kessler stating that the Court's demand for a $4000 per month garnishment was in violation of federal law.

272.   In an proceeding on the Record February 28, 2018 Judge Kessler ruled that he was vacating the Garnishment Order, in light of the DOL letter, however remarkably, Judge Kessler insisted that the Garnishment Order was not illegal it was just "mislabeled."

273.   Moreover, on February 28, 2018 the family court, despite vacating the illegal order which Judge Kessler insisted was not illegal, issued a new order stating:

> 1.  Defendant [Malhan] is found to be in violation of litigants rights for his failure to pay Plaintiff Spousal and Child Support Arrears in the amount of $4,000 per month ($3000 towards child support and $1000 towards spousal support arrears), ~~in accordance with paragraph 1 of the August 1, 2017 Wage Garnishment Order~~ in accordance with the purpose of paragraph 19 of the August 1, 2017 Order.  …
> 3.  Defendant is hereby sanctioned in accordance with R. 1:10-3 in the amount to be determined appropriate by the Court by the payment of counsel fees.  The application for counsel fees shall be limited to enforcement of child support.

Court Order Feb 28, 2018

274.   In other words, on February 28, 2017 the Court per Judge Kessler found Malhan to be in violation of litigants rights for failing to comply with "the purpose" of the August 1 2017 Garnishment Order that the DOL had determined was a illegal as a violation of federal law.

275.   In an Order dated March 29, 2019, the Court per Judge Kessler ultimately sanctioned Malhan $9,231.12 as the amount left open as part of the Feb 28 Order.

276.   In a separate order also dated Feb 28, 2019, the Court per Judge Kessler Ordered: "All Garnishment Orders that apply to Malhan are VACATED."

277.   Malhan did not have income in 2019 to pay $3000 per month in child support.

278.   In late 2019 NJ Probation again began to insist that Malhan owed child support.

279.   In early December 2019, in a letter dated 11/29/2019 Essex Probation sent what is called "Income Withholding Order/Notice of Support" to Malhan's company SpaceAge demanding that SpaceAge garnish Malhan's pay $7000 per month.

280.   There was no month in 2019 that Malhan was paid $7000, so the 11/29/19 Notice effectively seeks to garnish 100% of Malhan's wages.

281.   The 2017 Court Order to withhold $7000 per month from Malhan also exceeds the limit placed on such garnishment by CSEA. 45 CFR 303.100; 15 U.S. Code § 1673.

282.    $7000 represented 89% of Malhan's average paycheck for 2017, but actually is over 100% for three of the four wage payments he received in 2017.

283.   The CSEA also only authorizes garnishment of the wages of noncustodial parents, and thus prohibits wage garnishment of custodial parents like Malhan. 45 CFR 302.70(a); 45 CFR 303.100.

284.   As the Supreme Court has also noted: "The Federal Government has created an elaborate procedural mechanism designed to help both the government and custodial parents to secure the payments to which they are entitled." Turner v. Rogers, 564 U.S. 431, 444 (2011) (emphasis added).

285.   Malhan also was required by Court order to pay several mortgages out of his post-separation income which cost him several thousand dollars.

286.   Insofar as the $3000 + $4000 payments were set forth separately, 45 CFR § 303.100(a) specifically requires that the <u>entire amount</u> of support by withheld at the same time and not portioned up:

> (a) General withholding requirements.
>
> (1)   The State must ensure that in the case of each noncustodial parent against whom a support order is or has been issued or modified in the State, and is being enforced under the State plan, so much of his or her income as defined in sections 466(b)(1) and (8) of the Act must be withheld, in accordance with this section, as is necessary to comply with the order.
>
> (2)   In addition to the amount to be withheld to pay the current month's obligation, the amount to be withheld must include an amount to be applied toward liquidation of overdue support.

287.   Accordingly, the "withheld amount" must account for both "the current month's obligation" and "overdue support."

288.   In other words, the 65% cap applies to the total payments for both the "withheld amount" must account for both "the current month's obligation" and "overdue support."

289.   That the 65% cap applies to the total amount of support both current and alleged arearage is further emphasized by § 303.100(a)(5) which provides:

> (5) If there is more than one notice for withholding against a single noncustodial parent, the State must allocate amounts available for withholding giving priority to current support up to the limits imposed under section 303(b) of the Consumer Credit Protection Act (15 U.S.C. 1673(b)).

290.   Accordingly, the limits imposed by the Consumer Credit Protection Act apply to the total amount of past and present support ordered—here $7000.

291.   Federal Courts have repeatedly held that child support orders entered in violation of 15 U.S. Code § 1673 are illegal. Donovan v. Hamilton County Mun.

Ct., 580 F. Supp. 554 (S.D. Ohio 1984); Hodgson v. Hamilton Municipal Court, 349 F.Supp. 1125, 1140 (S.D.Ohio 1972)).

292.   Accordingly, a $7000 garnishment is illegal.


Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

e.      Declare under the Declaratory Judgment Act that garnishment of a custodial parents wages is prohibited under CSEA;

f.       b.      Preliminarily and permanently enjoin State Defendants from garnishing Malhan's salary so long as he is a custodial parent;

g.      In the alternative, grant declaratory and injunctive relief to Malhan that State Defendants may not garnish payments which are not "earnings" nor garnish payments above what is permitted by the Consumer Credit Protection Act  and 45 CFR Section 303.100(e);

h.      Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

e.      Award Plaintiff other and further relief as the Court deems just and proper.


Respectfully Submitted,

__/s/ Paul A. Clark_____
Paul A. Clark, Esquire NJ # 04261-2011
10 Huron Ave, #1N
Jersey City, NJ 07306
(202) 368 5435

# INCOME WITHHOLDING FOR SUPPORT

- [x] **INCOME WITHHOLDING ORDER/NOTICE FOR SUPPORT (IWO)**
- [ ] **AMENDED IWO**
- [ ] **ONE-TIME ORDER/NOTICE FOR LUMP SUM PAYMENT**
- [ ] **TERMINATION OF IWO**                                  Date: <u>11/29/2019</u>

---

[x] Child Support Enforcement(CSE) Agency [ ] Court [ ] Attorney [ ] Private Individual/Entity (Check One)

**NOTE:** This IWO must be regular on its face. Under certain circumstances you must reject this IWO and return it to the sender (see IWO instructions www.acf.hhs.gov/css/resource/income-withholding-for-support-instructions). If you receive this document from someone other than a state or tribal CSE agency or a court, a copy of the underlying support order must be attached.

---

| | | | |
|---|---|---|---|
| State/Tribe/Territory | **State of New Jersey** | Remittance ID (include w/payment) | CS90726567A |
| City/County/Dist./Tribe | **ESSEX PROBATION** | Order ID | FM-07-001952-14 |
| Private Individual/Entity | **Probation Division, Child Support Enforcement** | Case ID | CS90726567A |

---

| | | |
|---|---|---|
| SPACEAGE CONSULTING C | RE: | **MALHAN SURENDER** |
| Employer/Income Withholder's Name | | Employee/Obligor's Name (Last, First, Middle) |
| 10 HURON AVE APT 1N, T/A SPACE AGE TECHNOL | | ▓▓▓▓▓ |
| Employer/Income Withholder's Address | | Employee/Obligor's Social Security Number |
| ATTN: T/A SPACE AGE TECHNOL | | ▓▓ 1960 |
| JERSEY CITY, NJ 073063627 US | | Employee/Obligor's Date of Birth |
| | | MYRONOVA ALINA |
| Employer/Income Withholder's FEIN   223442971 | | Custodial Party/Obligee's Name (Last, First, Middle) |
| Child(ren)'s Name(s) (Last, First, Middle) | | Child(ren)'s Birth Date(s) |
| ▓▓▓▓▓▓▓ | | ▓ 2009 |
| | | ▓ /2006 |

---

**ORDER INFORMATION:** This document is based on the support order from **State of New Jersey** (State/Tribe).

You are required by law to deduct these amounts from the employee/obligor's income until further notice.

| | | | |
|---|---|---|---|
| $ 3,000.00 | Per **MONTHLY** | current child support | |
| $ 4,000.00 | Per **MONTHLY** | past-due child support-**Arrears greater than 12 weeks?** [ ] Yes [x] No | |
| $ 0 | Per | current cash medical support | |
| $ 0 | Per | past-due cash medical support | |
| $ 0 | Per | current spousal support | |
| $ 0 | Per | past-due spousal support | |
| $ 0 | Per | other (must specify) _____ | . |

for a **Total Amount to Withhold** of $   7,000.00   per   **MONTHLY**   .

**AMOUNTS TO WITHHOLD:** You do not have to vary your pay cycle to be in compliance with the *Order Information*. If your pay cycle does not match the ordered payment cycle, withhold one of the following amounts:

| | | | |
|---|---|---|---|
| $ 1,615.38 | per weekly pay period | $ 3,500.00 | per semimonthly pay period (twice a month) |
| $ 3,230.77 | per biweekly pay period (every two weeks) | $ 7,000.00 | per monthly pay period |
| $ _____ | **LUMP SUM PAYMENT.** Do not stop any existing IWO unless you receive a termination order. | | |

Document Tracking ID        <u>CS006/CASE ID: CS90726567A</u>

---

| | | | |
|---|---|---|---|
| Income Withholding for Support (IWO) | OMB 0970-0154 | Expiration Date: 08/31/2020 | Page 1 of 4 |

1418-01-01-0002729-0002-0011389



CS006,72213273

EXH 1 TO THIRD AMENDED COMPLAINT



| Employer's Name: | **SPACEAGE CONSULTING C** | Employer FEIN: | **223442971** |
|---|---|---|---|
| Employee/Obligor's Name: | **MALHAN SURENDER** | SSN: | ▇▇▇▇▇ |
| Case Identifier: | **CS90726567A** | Order Identifier: | **FM-07-001952-14** |

***REMITTANCE INFORMATION:*** If the employee/obligor's principal place of employment is <u>**within the State of New Jersey or is registered to conduct business within New Jersey**</u> (State/Tribe), you must begin withholding no later than the first pay period that occurs <u>5</u> days after the date of <u>11/29/2019</u>. Send payment within <u>1</u> business days of the pay date. If you cannot withhold the full amount of support for any or all orders for this employee/obligor, withhold <u>65%</u> of disposable income for all orders. If the obligor is a non-employee, obtain withholding limits from Supplemental Information. If the employee/obligor's principal place of employment is not <u>**within the State of New Jersey or is not registered to conduct business within New Jersey**</u> (State/Tribe), obtain withholding limitations, time requirements, and any allowable employer fees from the jurisdiction of the employee/obligor's principal place of employment. State-specific withholding limit information is available at www.acf.hhs.gov/css/resource/state-income-withholding-contacts-and-program-requirements For tribe-specific contacts, payment addresses, and withholding limitations, please contact the tribe at www.acf.hhs.gov/sites/default/files/programs/css/tribal_agency_contacts_printable_pdf.pdf or https://www.bia.gov/tribalmap/DataDotGovSamples/tld_map.html

For electronic payment requirements and centralized payment collection and disbursement facility information [State Disbursement Unit (SDU)], see www.acf.hhs.gov/css/employers/employer-responsibilities/payments

Include the Remittance ID with the payment and if necessary this locator code: <u>3400000</u>.

| |
|---|
| Remit payment to <u>New Jersey Family Support Payment Center (NJFSPC)</u> (SDU/Tribal Order Payee) at <u>NJ Support Payment Center</u> , <u>P.O. Box 4880</u> , <u>Trenton</u> , <u>NJ</u> , <u>08650</u> (SDU/Tribal Payee Address) |

☐ **Return to Sender (Completed by Employer/Income Withholder).** Payment must be directed to an SDU in accordance with sections 466(b)(5) and (6) of the Social Security Act or Tribal Payee (see Payments to SDU below). If payment is not directed to an SDU/Tribal Payee or this IWO is not regular on its face, you *must* check this box and return the IWO to the sender.

| If Required by State or Tribal Law: | |
|---|---|
| Signature of Judge/Issuing Official: | |
| Print Name of Judge/Issuing Official: | **SHAQUANA SMITH** |
| Title of Judge/Issuing Official: | **INVESTIGATOR** |
| Date of Signature: | |

If the employee/obligor works in a state or for a tribe that is different from the state or tribe that issued this order, a copy of this IWO must be provided to the employee/obligor.

☐ If checked, the employer/income withholder must provide a copy of this form to the employee/obligor.

## ADDITIONAL INFORMATION FOR EMPLOYERS/INCOME WITHHOLDERS

State-specific contact and withholding information can be found on the Federal Employer Services website located at www.acf.hhs.gov/css/resource/state-income-withholding-contacts-and-program-requirements

Employers/income withholders may use OCSE's Child Support Portal (https://ocsp.acf.hhs.gov/csp/) to provide information about employees who are eligible to receive a lump sum payment, have terminated employment, and to provide contacts, addresses, and other information about their company.

**Priority:** Withholding for support has priority over any other legal process under State law against the same income (section 466 (b)(7) of the Social Security Act). If a federal tax levy is in effect, please notify the sender.

**Combining Payments:** When remitting payments to an SDU or tribal CSE agency, you may combine withheld amounts from more than one employee/obligor's income in a single payment. You must, however, separately identify each employee/obligor's portion of the payment.

**Payments To SDU:** You must send child support payments payable by income withholding to the appropriate SDU or to a tribal CSE agency. If this IWO instructs you to send a payment to an entity other than an SDU (e.g., payable to the custodial party, court, or attorney), you must check the box above and return this notice to the sender. Exception: If this IWO was sent by a court, attorney, or private individual/entity and the initial order was entered before January 1, 1994 or the order was issued by a tribal CSE agency, you must follow the "Remit payment to" instructions on this form.

1418-01-01-0002729-0003-0011390



CS006,72213273

EXH 1 TO THIRD AMENDED COMPLAINT



| Employer's Name: | SPACEAGE CONSULTING C | Employer FEIN: | 223442971 |
|---|---|---|---|
| Employee/Obligor's Name: | MALHAN SURENDER | SSN: | ▮▮▮▮▮ |
| Case Identifier: | CS90726567A | Order Identifier: | FM-07-001952-14 |

**Reporting the Pay Date:** You must report the pay date when sending the payment. The pay date is the date on which the amount was withheld from the employee/obligor's wages. You must comply with the law of the state (or tribal law if applicable) of the employee/obligor's principal place of employment regarding time periods within which you must implement the withholding and forward the support payments.

**Multiple IWOs:** If there is more than one IWO against this employee/obligor and you are unable to fully honor all IWOs due to federal, state, or tribal withholding limits, you must honor all IWOs to the greatest extent possible, giving priority to current support before payment of any past-due support. Follow the state or tribal law/procedure of the employee/obligor's principal place of employment to determine the appropriate allocation method.

**Lump Sum Payments:** You may be required to notify a state or tribal CSE agency of upcoming lump sum payments to this employee/obligor such as bonuses, commissions, or severance pay. Contact the sender to determine if you are required to report and/or withhold lump sum payments.

**Liability:** If you have any doubts about the validity of this IWO, contact the sender. If you fail to withhold income from the employee/obligor's income as the IWO directs, you are liable for both the accumulated amount you should have withheld and any penalties set by state or tribal law/procedure.

_____

_____

_____

**Anti-discrimination:** You are subject to a fine determined under state or tribal law for discharging an employee/obligor from employment, refusing to employ, or taking disciplinary action against an employee/obligor because of this IWO.

_____

_____

_____

**Withholding Limits:** You may not withhold more than the lesser of: 1) the amounts allowed by the Federal Consumer Credit Protection Act (CCPA) [15 USC § 1673(b)]; or 2) the amounts allowed by the law of the state of the employee/obligor's principal place of employment, if the place of employment is in a state; or the tribal law of the employee/obligor's principal place of employment if the place of employment is under tribal jurisdiction. Disposable income is the net income after mandatory deductions such as: state, federal, local taxes; Social Security taxes; statutory pension contributions; and Medicare taxes. The federal limit is 50% of the disposable income if the obligor is supporting another family and 60% of the disposable income if the obligor is not supporting another family. However, those limits increase 5% - to 55% and 65% - if the arrears are greater than 12 weeks. If permitted by the state or tribe, you may deduct a fee for administrative costs. The combined support amount and fee may not exceed the limit indicated in this section.

Depending upon applicable state or tribal law, you may need to consider amounts paid for health care premiums in determining disposable income and applying appropriate withholding limits.

**Arrears Greater Than 12 Weeks?** If the _Order Information_ section does not indicate that the arrears are greater than 12 weeks, then the employer should calculate the CCPA limit using the lower percentage.

**Supplemental Information:**

_____

_____

_____

_____

Income Withholding for Support (IWO)                                    Page 3 of 4



CS006,72213273                EXH 1 TO THIRD AMENDED COMPLAINT



ESSEX-PROBATION
PO BOX 372
CHILD SUPPORT ENF UNIT
NEWARK      NJ 071010372

ESSEX-PROBATION
PO BOX 372
CHILD SUPPORT ENF UNIT
NEWARK      NJ 071010372
PHONE(S)(877) 655-4371

NOVEMBER 15, 2019

** CONTACT ADDRESS ABOVE **

191107

SURENDER MALHAN
10 HURON AVE APT 2L
049569            JERSEY CITY NJ 07306-3610
|ıl₁|ıₐₐₐ|lₐ||||₁bₐb|ₐbl₁ₐ||lₐ||||l₁|ₐb|₁ll₁|lₐₐb|₁ₐₐ|l|

| SSN | CASE NUMBER | LOCAL ID | PAST DUE AMOUNT CLAIMED |
|---|---|---|---|
| ▆▆▆ | CS90726567A | 013 | $3,000.00 (NON-TANF) |

The agency identified above has determined that you owe past-due child and/or spousal support. Our records show that you owe at least the amount shown above. If your case was submitted to the United States Department of the Treasury for collection in the past, this amount is subject to collection at any time by Administrative Offset and/or Federal Tax Refund Offset. If your case has not already been submitted to the United States Department of the Treasury and you do not pay in full within 30 days from the date of this notice, this amount will be referred for collection by Administrative Offset and/or Federal Tax Refund Offset. Under Administrative Offset (31 U.S.C.3716), certain Federal payments that might otherwise be paid to you will be intercepted, either in whole or in part, to pay past-due child and/or spousal support. Under Federal Tax Refund Offset (42 U.S.C.664;26 U.S.C.6402), any Federal Income Tax Refund to which you may be entitled will be intercepted to satisfy your debt. The amount of your past-due support will also be reported to consumer reporting agencies.

If you owe or owed arrearages of child support in an amount exceeding $2,500, the agency identified above will certify your debt to the State Department pursuant to 42 USC 654(31). Once you are certified, the Secretary of State will refuse to issue a passport to you, and may revoke, restrict or limit a passport that was previously issued.

Your debt will remain subject to Federal Tax Refund Offset, Administrative Offset, and/or passport certification until it is paid in full. Important: If you owe current support, any further arrears accruing due to payments missed may be added to your debt and will be subject to collection by Federal Tax Refund Offset and/or Administrative Offset now or in the future without further notice. To determine additional amounts owed or the total amount past-due which the agency has submitted for collection, you may contact us at the address or phone number listed above.

You have a right to contest our determination that this amount of past-due support is owed, and you may request an administrative review. To request an administrative review, you must contact us at the address or phone number listed above within 30 days of the date of this notice. If your support order was not issued in our state, we can conduct the review or, if you prefer, the review can be conducted in the state that issued the support order. If you request, we will contact that state within 10 days after we receive your request and you will be notified of the time and place of your administrative review by the state that issued the order. All requests for administrative review, or any questions regarding this notice or your debt, must be made by contacting the agency identified above.

If you are married, filing a joint income tax return, and you incurred this debt separately from your spouse, who has no legal responsibility for the debt and who has income and withholding and/or estimated tax payments, your spouse may be entitled to receive his or her portion of any joint Federal Tax Refund. If your spouse meets these criteria, he or she may receive his or her portion of the joint refund by filing a Form 8379 - Injured Spouse Claim and Allocation. Form 8379 should be attached to the top of the Form 1040 or 1040A when you file, or filed according to other instructions as indicated on the Form 8379.